IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

Plaintiff,

v.

$9,578.55 SEIZED FROM WELLS FARGO ACCOUNTS,

$17,285.02 SEIZED FROM US BANK ACCOUNT,

$675.25 SEIZED FROM BANK OF THE WEST ACCOUNT,

$2,954.55 SEIZED FROM WASHINGTON MUTUAL ACCOUNT,

$7,299.15 SEIZED FROM COMPASS BANK ACCOUNT,

$1,900.00 IN U.S. CURRENCY SEIZED FROM 200 CLAYTON STREET UNIT 2,

$15,000.00 SEIZED FROM U.S. COURT REGISTRY,

$802.25 SEIZED FROM GREG MONTGOMERY,

$4,000.00 SEIZED FROM GREG MONTGOMERY,

ARTWORK SEIZED FROM 200 CLAYTON STREET UNIT 2,

ELECTRONIC EQUIPMENT SEIZED FROM 200 CLAYTON STREET UNIT 2, and

JEWELRY SEIZED FROM 200 CLAYTON STREET UNIT 2.

Defendants.
_____

VERIFIED COMPLAINT FOR FORFEITURE *IN REM*
_____

The United States of America, by and through Acting United States Attorney

David M. Gaouette and Assistant United States Attorney Tonya S. Andrews, pursuant to

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions

G(2), states:

## JURISDICTION AND VENUE

1.      The United States of America (the "United States") has commenced this action pursuant to the civil forfeiture provisions of 21 U.S.C. §881, seeking forfeiture of the defendant property involved in the narcotics provisions of 21 U.S.C. § 801 et seq. This Court has jurisdiction under 28 U.S.C. §1345 and 1355.

2.      Venue is proper under 21 U.S.C. §881 (j), 19 U.S.C. §1605, and 28 U.S.C. §1395, as the defendant property is located, and most of the acts described herein occurred, in the District of Colorado.

## DEFENDANT PROPERTY

3.  Defendant property is fully described below:

a.  $9,578.55 seized pursuant to Federal Seizure Warrant 07-MC-0075 from Wells Fargo Bank account #s 101-5059402 and  957-6702469 in the name of Samuel  Orozco ("defendant Wells Fargo Money").

b.  $17,285.02 seized pursuant to Federal Seizure Warrant 07-MC-0071 from US Bank account # 103657018554 in the names of Samuel Orozco and Ana Orozco ("defendant US Bank Money").

c.  $675.25 seized pursuant to Federal Seizure Warrant 07-MC-0072 from Bank of the West account # 467-067989 in the name of Samuel Orozco and Beatriz Carrillo ("defendant Bank of the West Money").

d. $2,954.55 seized pursuant to Federal Seizure Warrant 07-MC-0073 from Washington Mutual Bank account #s 312-377693-8 in the name of Samuel Orosco ("defendant WAMU Money").

e. $7,299.15 seized pursuant to Federal Seizure Warrant 07-MC-0069 from Compass Bank account # 2505853485 in the name of Samuel Orozco ("defendant Compass Bank Money"); [all accounts described in paragraphs a-e above, collectively referred to as "defendant Bank Accounts".]

f. $1,900.00 in United States Currency ("defendant $1,900.00") seized from 200 Clayton Street, Unit 2, Denver, Colorado;

g. $15,000.00 held by the Clerk of the U.S. District Court in the case of United States vs. Joseph Torrez, III seized pursuant to Federal Seizure Warrant  07-MC-0097 ("defendant $15,000.00").

h.. $802.25 and $4,000.00 in United States currency seized from Gregory Montgomery ("defendant $4,802.25 USC"); [as described in paragraphs f-h above, all collectively referred to as "defendant Currency."]

i. Artwork seized from 200 Clayton Street, Unit 2, Denver, Colorado, the residence of Samuel Orozco, ("defendant Artwork"), more particularly described as follows:

- "Bridge Over Troubled Water" painting by Raymond Zhang
- Metal Shield by J.P. Garner
- Oil on Canvas Painting by Giorgio Michele Rocca
- Glass bowl with wooden stand
- Orange glass bowl by George Bucquet
- Metal frame and two piece glass art by Roger Thomas
- "Lunar Landing 06" painted metal sculpture by Robin L. Washburn
- Oil Painting (40" x 40") by Jose Manuel Reyes Ruiz
- Oil on Canvas Painting – Guitar, Tequila, and Lime
- Gaya Glass  17" Waterfall Bowl

j.  Electronic Equipment seized from 200 Clayton Street, Unit 2, Denver, Colorado, the residence of Samuel Orozco, ("defendant Clayton Electronics"), more particularly described as follows:

- Fujitsu P50XTA51US 50-inch Plasma HDTV
- Fijitsu PDS4242W-S 42-inch Plasma HDTV
- Sony KE32TS2U 32-inch Plasma HDTV
- Denon AVR 1803 Audio Receiver
- Yamaha TX V995 Audio Receiver
- Yamaha RX 397 Audio Receiver
-  Sonance Sonamp 275SE Amplifier
- Bang & Olufsen BEOLAB 9000 CD Player
- Sony DVD Player
- Yamaha DVD C900 DVD Player
- Denon DVD3910 DVD Player
- Definitive Technology Speakers
- Paradigm CC 170 Center Speaker
- Bang & Olufsen (2) BEOLAB 800 Speakers
- Sunfire Teu Subwoofer Signature Series (Robert Carvers)

k.  Jewelry seized from 200 Clayton Street Unit 2, Denver, Colorado, the residence of Samuel Orozco, ("defendant Clayton Jewelry"), more particularly described as follows:

- Gentleman's stainless steel Cartier watch
- Gentleman's black Movado watch
- Gentleman's Patek Philippe platinum watch
- Lady's 18 karat yellow gold diamond ring
- Gentleman's 18 karat yellow gold Cartier watch
- Gentleman's two tone, 14 karat gold and stainless steel Omega watch;

[described in paragraphs i-k above, all collectively referred to as "defendant Personal Property."]

All of defendant property is currently being held by the Drug Enforcement Administration, the United States Marshals Service, or the Internal Revenue Service, Criminal Investigation Division in Denver, Colorado.

FACTUAL BASIS FOR FORFEITURE

Except as otherwise noted, all of the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

Overview of the Orozco Drug Trafficking Organization

4.  Since at least September 2001, Samuel Everret Orozco (Orosco) has been the head of an extensive Drug Trafficking Organization (DTO) operating in the Denver, Colorado area.  The Orozco DTO is comprised in part by Joseph Torrez III; Gregory Montgomery; Ana Nemecia Orozco (Orosco), estranged wife of Samuel; Beatriz Munoz-Carillo, girlfriend of Samuel; Evaristo Orozco (Orosco),  father of Samuel; Martha Orosco (Orozco),  mother of Samuel, and others known and unknown.

5.  The investigation began in January of 2007, when approximately 24 kilograms of cocaine were seized in Topeka, Kansas during a consent search of a 2003 Land Rover driven by Daniel Russell Valdez and Gregory Wayne Montgomery.  Kansas Highway Patrol discovered vacuum sealed packages of cocaine floating inside the gas tank of the Land Rover. Valdez and Montgomery were arrested and both agreed to cooperate with law enforcement.  Officers conducted a controlled delivery of the cocaine to Joseph S. Torrez, III,  (Torrez), who is the individual identified by Valdez and Montgomery as the Denver organizer of their trip.  Torrez was arrested after the completion of the controlled delivery.  In subsequent interviews, Valdez, Montgomery, and Torrez identified Samuel Orozco as the head of the DTO for which they were transporting this, and other loads of cocaine.

6.  The investigation has revealed that from September 2001 to December 2007, Orozco and his DTO have imported, transported, stored, possessed, and distributed at least 960 kilograms of cocaine, at $16,500 per kilogram for a total of approximately $15,000,000 worth of cocaine.

7.  Numerous individuals of the Orozco DTO have been interviewed and have corroborated and confirmed that cocaine and the illegal proceeds from the sale of the cocaine were transported on a regular basis to/from/between a residence owned by Orozco in Juarez, Mexico to the United States, including the Denver, Colorado area.

<u>Torrez Interviews</u>

8.  During interviews, Torrez told agents he was one of many couriers for the Orozco DTO.  At Orozco's direction, Torrez had transported the load of cocaine containing 24 kilograms seized in Kansas from El Paso, Texas, to Denver, Colorado. Torrez has been involved with the Orozco DTO since at least 2001 when he was selling ounce quantities of cocaine supplied by Orozco for $600 per ounce.  Torrez gradually increased the quantities of cocaine and now was purchasing kilogram quantities of cocaine from Orozco for $16,500 and then selling up to ½ kilogram quantities to his customers.  Torrez further facilitated Orozco's drug trafficking activities by driving vehicles with drugs or drug money secreted inside (hereinafter load vehicles).  Land Rovers were the Orozco DTO's vehicle of choice because cocaine or drug money was easily concealed inside the gas tanks. Torrez would travel to El Paso, Texas, and either pick up a load vehicle in El Paso, Texas, or cross the border into Mexico and go to Orozco's residence in Juarez, Mexico and pick up a load vehicle there.   Torrez would meet Sebastian De Los Santos-Hernandez, who was responsible for loading and

concealing the cocaine within the gas tank of the Land Rover, at Orozco's residence in Juarez and he would load the Land Rover with cocaine; Torrez would then drive the loaded vehicle back to Denver, Colorado.  Orozco would fly on commercial flights back to Denver, Colorado.  Once Torrez had successfully passed through Border Patrol check stations in El Paso, Texas, Torrez would call Orozco and ask him if he wanted "to have dinner" as code that he had successfully passed through the border without the cocaine being detected.  Once in Denver, Torrez would use the security number to gain access into the gated community where Orozco lived at 5910 South Ogden Court, Centennial, Colorado, dropping off the load vehicle at the residence.  Torrez indicated that he had delivered load vehicles containing cocaine to Ogden Court on at least six occasions. Torrez also indicated that he would also drive load vehicles of cocaine for Orozco to other locations in Denver.

9.  Orozco paid Torrez for his courier services either in cash or cocaine.  On some occasions, Orozco would pay Torrez at Orozco's residence on Ogden Court after Torrez had dropped off a load vehicle of cocaine.  Other times, Orozco would leave a quantity of cocaine (up to kilogram quantities) for Torrez inside Torrez' apartment as his payment for his courier services.

10.  Torrez also indicated that he maintained business and personal bank accounts in his name and the name of his business JST Signs at Commercial Federal Savings & Loan (currently Bank of the West), Wells Fargo and another bank which he could not remember.  Orozco would routinely give Torrez large sums of currency, sometimes $20,000 at a time, from his illegal drug business.  Orozco instructed Torrez to deposit the drug money into Torrez's bank accounts in increments of $3,000 or less, to avoid

suspicion by banking officials or law enforcement.   During these meetings Orozco

educated Torrez concerning the banks reporting requirements concerning currency

deposits and withdraws.   Orozco stressed the importance of not alerting officials with

high dollar deposits and withdraws thereby avoiding suspicion.   Orozco also instructed

Torrez to endorse checks made payable to Torrez over to Orozco to create the appearance

that the money (check) was for some sort of legitimate work, disguising the illegal source

of the money.   Orozco also instructed Torrez to use these funds to purchase vehicles for

Orozco to use as load vehicles in his DTO.

11.   Orozco maintained and held the titles to the vehicles even though the

vehicles were titled in Torrez' or another person's name.   Torrez did not object to this

practice because Torrez considered the vehicles to be owned by Orozco and were

purchased with money given to him by Orozco.

12.   Torrez also told law enforcement officers that Orozco has attempted to

influence Torrez to alter his potential testimony in relation to his arrest on January 20,

2007, to avoid implicating Orozco in the cocaine trafficking business.   On or about

January 24, 2007, Orozco wrote a check for $40,000 payable to Juliana Atencio, Torrez'

former common-law-wife.   The check was converted to a cashier's check and then

deposited into an account maintained by Juliana Atencio at Bank of the West.   On or

about January 30, 2007, Juliana Atencio provided the federal courts with a payment of

$50,000 for the Appearance Bond for Torrez' release.   Pursuant to United States District

Court Civil Seizure Warrant (Case No. 07-MC-0097), defendant $15,000 of the bond was

seized as drug proceeds provided by Orozco.

<u>Gregory Montgomery Interview</u>

13.   Gregory Montgomery was interviewed after his arrest with Torrez in January, 2007 and he told law enforcement officers that he became involved in the Orozco DTO in 2006, after he saw the amount of money Torrez was earning from the Orozco DTO. Montgomery worked for Torrez at JST Signs.  Montgomery was interviewed by Orozco for the job of driving cocaine for Orozco's DTO.  Orozco made and kept a copy of Montgomery's driver's license, as well as photos of Montgomery's children. Montgomery began driving loads of cocaine to Atlanta, Georgia for Orozco. Montgomery indicated that the loads to Atlanta were similar in size to the 24 kilograms seized in Kansas because during previous trips to Atlanta it was necessary to re-fuel every 100-150 miles, due to minimal space remaining in the fuel tank after the cocaine was hidden in the fuel tank.  Montgomery had completed approximately 8-10 trips to Atlanta, Georgia for Orozco's DTO, transporting approximately 192 to 240 kilograms of cocaine.  Montgomery indicated that whenever Orozco instructed Montgomery to drive a vehicle loaded with cocaine from Mexico he would stay at Orozco's house in Juarez, Mexico, the night before traveling to the United States.  Montgomery also indicated, as did Torrez, that Sebastian loaded the drugs into the vehicles at Orozco's Juarez residence.

14.   Montgomery indicated that Orozco organized the trip when he and Valdez were arrested in possession of the 24 kilograms of cocaine.  Montgomery indicated that he met with Orozco on or about January 15 or 16, 2007 at 200 Clayton Street, Denver Colorado, a listed residence of Samuel Orozco.  At the meeting at 200 Clayton Street, Orozco went to a back area of the residence, and after a while came back with a large black bag.  Orozco gave Montgomery $6,000 in currency from the bag.  Montgomery

noticed there was another bag within the black bag and it contained  packets consisting of 20 dollar bills, just like the packets Montgomery was given.

15.   Like Torrez, Montgomery was educated by Orozco regarding the banking procedures and reporting requirements for currency.  Orozco explained to Montgomery that if he followed Orozco's instructions he would avoid drawing attention to the currency transactions, and avoid detection by the IRS.  Orozco instructed Montgomery to diversify his money and deposits among different banks; use big banks, such as Wells Fargo and US Bank; and make deposits of currency of no more than $2,500 any time.

16.   Orozco also instructed Montgomery to purchase two safes for Montgomery's house, keeping one safe where it could be easily found, leaving only a small amount of currency in it.  The other safe would contain the "big money" and would be well hidden in another part of the house.  That way, if anyone ever broke into the house they would find the first safe, take the money, think they had all the money, and not look for the second safe with the "big money."

17.   Montgomery also told law enforcement that the Orozco DTO would use a car as a load vehicle on a limited basis.  For example, a vehicle would be used with temporary plates only 3 times to cross the border from Mexico to the United States, and then 4 times with regular plates.  The load vehicles were then registered in another person's name and a new license plate was obtained in the same manner.

18.  After Montgomery's arrest, Orozco has also attempted to purchase and/or influence Montgomery's testimony.  Montgomery received a call from someone who he believes was Sebastian indicating, "If you will own up to this charge, we will provide for your family; otherwise, we'll take care of your family."  Shortly after this call, Orozco

told Montgomery that he had left a cellular telephone at the Cherry Creek Mall Customer

Service desk for Montgomery to obtain and then use that phone to contact Orozco.

Orozco also instructed Montgomery to write a letter to Judge Nottingham, admitting full

responsibility for the drugs found in the vehicle and absolving Torrez of any

involvement.  Orozco told Montgomery that if he did this and served the resulting jail

time, Orozco would take care of his ex-wife, his current girlfriend, and his child support.

Orozco also instructed Montgomery to drop off all discovery material relating to

Montgomery's case outside the mailbox at Orozco's Clayton Street residence.

19.  On or about April 26, 2007, Orozco contacted Montgomery on the cell phone

previously provided and directed Montgomery to meet him in the parking lot of Jared

Galleria Jewelry in Aurora, Colorado and there Orozco gave Montgomery defendant

$802.25 as a first payment.  On or about May 29, 2007, Orozco contacted Montgomery

using the cell phone Orozco had earlier provided, directing Montgomery to go to the

Cherry Creek Customer Service Desk and obtain a package.  Montgomery got the

package and it contained defendant $4,000.  Investigators believed from review of the

mall surveillance video that the package was delivered by Beatriz Carrillo (Orozco's

girlfriend) to the Cherry Creek Customer Service Desk.  In August 2007, Orozco again

telephoned Montgomery and discussed meeting with Montgomery to give Montgomery

"one paper" (code word meaning $1,000).  Orozco also asked Montgomery what name he

wanted to use to set up an account for payments to be made by Orozco for Montgomery's

benefit while Montgomery was in prison.

Financial Analysis

20.  During the course of the investigation to date, over 50 bank accounts have been identified as associated with the Orozco DTO, including but not limited to the following defendant Accounts:

> a.  Wells Fargo Bank - Account #s 101-5059402 and 957-6702469,
>
> b.  Washington Mutual Bank – Account # 312-377693-8,
>
> c.  Bank of the West – Account # 467-067989,
>
> d.  US Bank – Account #s 103657018554,
>
> e.  Compass Bank – Account # 2505853485, and
>
> f.  Key Bank – Account # 760452047391.

21.  A review of those accounts showed that over the time period of January 2000 to June 2007, over 1,300 deposits of currency in amounts less than $10,000 were made by Orozco, Ana M. Orozco, Cynthia Orosco, Evaristo Orosco, Martha Orosco, Tad Davis, Beatriz Carrillo, and Torrez into accounts held by, or on behalf of, Orozco.  A further review of these currency deposits showed that the technique prescribed by Orozco to Montgomery and Torrez, of making the deposits in increments of $3,000 or less to avoid suspicion by banking officials or law enforcement, appears to have been followed in these deposits into these accounts.

22.  Investigators have seen a pattern of activity in these accounts whereby Orozco would transfer funds between his accounts, accounts of other persons in his DTO, and entities and persons controlled by Orozco including: Northeast Clayton LLC, Colorado Lending, Ana M. Orozco, Cynthia Orosco, Evaristo Orosco, Martha Orosco, Tad Davis, Beatriz Carrillo, Luz Elena Rodriquez-Carrillo, Montgomery and Torrez.

Orozco also converted the funds into checks, cashier's checks or bank checks, and then purchased assets for himself or his DTO.

23.  For example, a $15,000 check written on or about October 9, 2006 was deposited into Montgomery's account by Orozco.  Additionally, investigators have determined that after this check was deposited, Orozco made additional deposits of currency, in a manner similar to that shown above, into Martha Orozco's account and into Montgomery's account.  Orozco then instructed Montgomery to write a check, from his (Montgomery's) account, in the amount of $21,357.53 made payable to Land Rover Flatirons.  This check by Montgomery was used to purchase a 2003 Land Rover Discovery which was then registered in the name of Joseph S Torrez III.  According to Torrez and Montgomery, this vehicle was then used as a load vehicle for the Orozco DTO.  This was also the vehicle in which Montgomery and Valdez were arrested on or about January 19, 2007, with the aforementioned approximately 24 kilograms of cocaine secreted within the gas tank of the vehicle.

### Defendant Bank Accounts Structuring

24.  A review of defendant Wells Fargo accounts from approximately May 2000 through September 2007 and approximately April 2005 through August 2007, respectively, U.S. Bank account from approximately August 2000 to December 2006, Bank of the West account from approximately December 2005 through September 2007, Washington Mutual Bank account from approximately June 2006 to August 2007, and Compass bank account from approximately September 2006 through April 2007 showed routine and frequent currency deposits approximately between $1,000 and $3,000,

indicating structuring to avoid notice and suspicion in the manner Orozco described to Torrez.

<u>Colorado Department of Revenue Records - Wages</u>

25.  Investigators obtained state wages from the Colorado Department of Revenue for the period 2000 to 2006, and the Colorado State Individual Income Tax Returns for Samuel Orozco, Ana Orozco, and Orozco's girlfriend, Beatriz Carrillo.  The review of those returns reflects minimal income for the years indicated.

Summary of Colorado State Form 104 Samuel and Ana Orozco

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Name | Orozco, Samuel and Ana | Orozco, Samuel and Ana | Orozco, Samuel and Ana | Orozco, Samuel and Ana | No Record | Orozco, Samuel and Ana |
| Address | 5910 S. Ogden Ct Littleton, CO | 5910 S. Ogden Ct Littleton, CO | 5910 S. Ogden Ct Littleton, CO | 5910 S. Ogden Ct Littleton, CO |  | 5910 S. Ogden Ct Littleton, CO |
| Federal Taxable Income | -76,128 | -59,823 | -161,275 | 3,785 |  | 48,547 |
| Colorado Taxable Income | -78,058 | -61,323 | -162,825 | 3,785 |  | 48,547 |

Summary of Colorado State Form 104 Beatriz Carrillo

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Name |  |  |  |  |  | Carrillo, Beatriz |
| Address |  |  |  |  |  | 900 W. 70th Place Denver, CO |
| Federal Taxable Income |  |  |  |  |  | -2,343 |
| Colorado Taxable Income |  |  |  |  |  | -2,343 |

26.   The Colorado Department of Revenue State Wage records for the period 2000 to 2006 show that Orozco was reported as earning a wage only in 2006 and 2007. During those years, Orozco's report wages were $30,000 for the last two quarters of 2006, and $10,000 for the first quarter of 2007.

Asset Acquisitions

Defendant Bank Accounts

27.   As detailed above since 2001 Orozco has been importing and distributing cocaine worth at least $15,000,000.  The investigation has revealed that over 50 bank accounts have been identified as associated with the Orozco DTO.  Orozco was aware of the bank reporting requirements and broke up over 1,300 deposits of drug currency in amounts less than $10,000 to avoid the Currency Transaction requirements.  The investigation has revealed that the Orozco DTO laundered at least $3,900,000 in drug proceeds through bank accounts, including Defendant Bank Accounts, in order to promote their drug trafficking activities and in order to avoid detection by law enforcement of their drug trafficking activities.

28.      All monies in Defendant Bank Accounts, totaling approximately $38,000, were seized as drug proceeds pursuant to Federal Seizure Warrants.

29.      Orozco and his estranged wife Ana have little to no reported legitimate income since 2000 but were able to deposit over $17,000 into defendant US Bank Account.

30.      Defendant Bank of the West account is jointly titled in Orozco and his girlfriend Beatriz Carrillo.  As detailed above Beatriz Carillo reported no income in 2000,

2001, 2002, 2003 and 2004, and reported a loss in 2005.  Beatriz Carillo had no

legitimate earnings to have deposited into this joint account with Orozco.

<u>Defendant Currency</u>

31.  Beginning in early 2007, the Orozco DTO was being dismantled by law

enforcement.  Torrez and Montgomery were arrested, search warrants were executed, and

assets were seized.  Torrez and Montgomery both have told agents that Orozco gave them

money (Defendant $4,802.25 in U.S. Currency) in an attempt in influence their potential

testimony.  Orozco utilized his drug proceeds (Defendant $15,000) to pay for Torrez'

Appearance Bond, allowing Torrez to be released from custody.   Orozco, through

Sebastian told Montgomery that "If you will own up to this charge, we will provide for

our family, otherwise; we'll take care of your family".  Shortly thereafter, defendant

$4,802.25 was given to Montgomery.  Montgomery then turned over defendant $4,802.25

to law enforcement agents.  Defendant $1,900.00 was seized as drug proceeds during the

execution of the search warrant at Orozco's residence, Clayton Street.

<u>Defendant Personal Property</u>

32.  Despite having limited legitimate income, Orozco was able to acquire

approximately $160,000.00 worth of expensive original artwork, high- end electronics,

and jewelry. All of the above-described defendant properties were purchased during the

time-frame that Orozco was heading the Orozco DTO.

<u>CONCLUSION</u>

33.  On June 18, 2007, Orozco, his estranged wife Ana Orozco, his girlfriend

Beatriz Carillo, his parents Evaristo and Martha Orozco, and others were indicted on

numerous drug and money laundering charges.  Samuel Orozco, the leader of the DTO,

has fled the jurisdiction of the United States, and as of yet has not been caught.  The remaining members of his family are currently challenging their charges.  The Orozco DTO has amassed millions and millions of illegal drug dollars, spending vast amounts of that drug money on acquiring expensive assets, including all of defendant assets, while reporting little to no legitimate income. In light of the above, the above-described defendant properties are proceeds furnished or intended to be furnished in exchange for a controlled substance, or proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate any violations of the drug charges, and, therefore, are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(1)(C).  Further, as described above, the defendant bank accounts constitute property involved in a money laundering transaction in violation of 18 U.S.C. section 1956 and, therefore, are subject to forfeiture pursuant to 18 U.S.C. section 981(a)(1)(A).

VERIFICATION OF ALBERT VILLASUSO,
DRUG ENFORCEMENT ADMINISTRATION SPECIAL AGENT

I, Albert Villasuso, hereby state and aver that I have read the foregoing Factual Basis for Forfeiture, and that the facts and information contained therein are true.


     s/Albert Villasuso
Albert Villasuso, Special Agent
Drug Enforcement Administration


STATE OF COLORADO        )
                          )ss.
CITY AND COUNTY OF DENVER)

The foregoing VERIFIED COMPLAINT FOR FORFEITURE IN REM was sworn to and subscribed before me this 11th day of March, 2009, by  Albert Villasuso, Drug Enforcement Administration, Special Agent.


     s/Pamela Thompson
Notary Public, State of Colorado

My Commission Expires:  05-03-2010

17

FIRST CLAIM FOR RELIEF

34.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

35.  By the foregoing and other acts, defendant Bank Accounts constitute money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §801, et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

SECOND CLAIM FOR RELIEF

36.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

37.  By the foregoing and other acts, defendant Bank Accounts constitute proceeds traceable to an exchange of controlled substances in violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

THIRD CLAIM FOR RELIEF

38.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

39.  By the foregoing and other acts, defendant Bank Accounts constitute money used or intended to be used to facilitate a violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

FOURTH CLAIM FOR RELIEF

40.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

41.  By the foregoing and other acts, defendant Currency constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §801, et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## FIFTH CLAIM FOR RELIEF

42.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

43.  By the foregoing and other acts, defendant Currency constitutes proceeds traceable to an exchange of controlled substances in violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## SIXTH CLAIM FOR RELIEF

44.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

45.  By the foregoing and other acts, defendant Currency constitutes money used or intended to be used to facilitate a violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## SEVENTH CLAIM FOR RELIEF

46.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

47.  By the foregoing and other acts, defendant Personal Property constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §801, et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## EIGTH CLAIM FOR RELIEF

48.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

49.  By the foregoing and other acts, defendant Personal Property constitutes proceeds traceable to an exchange of controlled substances in violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## NINTH CLAIM FOR RELIEF

50.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

51.  By the foregoing and other acts, defendant Personal Property constitutes money used or intended to be used to facilitate a violation of 21 U.S.C. §801 et seq., and therefore, is forfeited to the United States pursuant to 21 U.S.C. §881(a)(6).

## TENTH CLAIM FOR RELIEF

52.  The Plaintiff repeats and incorporates by reference each of the paragraphs above.

53.  By the foregoing and other acts, defendant Bank Accounts were involved in money laundering violations of 18 U.S.C. § 1956, and are therefore forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States prays for entry of a final order of forfeiture for defendant properties in favor of the United States, that the United States be authorized to dispose of the defendant properties in accordance with law, and that the Court enter a

finding of probable cause for the seizure of the defendant Currency and issue a Certificate

of Reasonable Cause pursuant to 28 U.S. C. § 2465.

Dated this 11th day of March, 2009.

Respectfully submitted,

DAVID M. GAOUETTE
Acting U.S. Attorney

By: s/Tonya S. Andrews
TONYA ANDREWS
Assistant U.S. Attorney
1225 Seventeenth Street, Ste. 700
Denver, Colorado 80202
Phone: (303) 454-0100
Fax: (303) 454-0402
tonya.andrews@usdoj.gov
Attorney for Plaintiff